UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:13-CV-1021-H

TIFFANY GRACE                                                                                    PLAINTIFF

v.

LVNV FUNDING, INC. and
PSI LOUISVILLE, INC.                                                                          DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This case raises the interesting question of when a "service charge" might actually constitute interest under Kentucky law. Defendant PSI Louisville ("PSI") collects debts for an emergency room that Grace once visited. The emergency room charges what its intake contract deems an 18% "service charge" on past due accounts. Grace failed to pay her bill and PSI eventually reported to various credit agencies a past due amount that included the "service charge." Grace argues that this "service charge" is actually disguised interest. If so, it would be usurious under Kentucky law, and PSI's attempt to collect interest to which neither it nor the emergency room was entitled violates three separate provisions of the Fair Debt Collection Practices Act ("FDCPA"). PSI has moved to dismiss Grace's claims and Grace has cross-motioned for summary judgment. These motions present questions concerning Kentucky's usury laws which the state's courts have yet to answer.

I.

On June 5, 2010, Grace received medical services from Physicians in Emergency Medicine ("PEM"), the emergency care group at Jewish Hospital, Louisville, Kentucky.[1] Upon admission, Grace signed an agreement accepting responsibility for charges for services rendered by PEM, including "any balance due in excess of amounts paid by other persons or agencies." The agreement contained the following clause:

> A service charge may be applied on all accounts which are 90 days or more past due at a rate of 1½% per month.

Grace did not pay her medical bill. In February 2012, PEM engaged PSI to collect the debt. PSI is not an assignee; rather, after a certain period of time has passed, PEM engages PSI to take over collection activity on its behalf on a contingency fee basis.[2] In May 2012, PSI reported Grace's debt and the accumulated 18% per annum "service charge" to various credit agencies. The original debt was for $292, but with the accumulated service charge, the total amount PSI reported in arrears was $411.

In May 2013, Grace obtained a credit report showing PSI had reported her PEM debt.[3] In September 2013, Grace filed suit in state court; Defendants removed the suit to federal court on October 18, 2013. Grace's complaint alleges that by reporting with her debt an amount she contends is disguised interest at a rate that violates Kentucky law, PSI has violated the FDCPA provisions that prohibit: (1) falsely representing the "character, amount, or legal status" of Grace's debt, 15 U.S.C. § 1692e2(A); (2) communicating credit information PSI knew or should have known to be false, 15 U.S.C. § 1692e(8); and (3) attempting to collect an amount

---

[1] PEM operates the emergency room for Jewish Hospital under contract. DN 21, ¶ 2.
[2] DN 21, ¶ 11: "[PSI is] paid forty percent of what we collect of the medical services including service fee, and PEM is paid the remainder."
[3] Grace filed for bankruptcy in July 2013 and her debt to PEM was eventually discharged that same year. Whether the consumer owes the alleged debt has no bearing on a suit brought pursuant to the FDCPA. *McCartney v. First Cty. Bank*, 970 F.2d 45, 47 (5th Cir. 1992) (quoting *Baker v. G.C. Servs. Corp.*, 677 F.2d 775, 777 (9th Cir. 1982) ("The Act is designed to protect consumers who have been victimized by unscrupulous debt collectors, regardless of whether a valid debt actually exists.")).

"(including any interest, fee, charge, or expense incidental to the principal obligation)" not permitted by law, 15 U.S.C. § 1692f(1).[4]

## II.

Here, not only has PSI presented matters outside of the pleadings, Grace has moved for summary judgment and PSI has fully responded. Thus, the Court will treat each motion as one for summary judgment. Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards under which the record is to be analyzed within the structure of Rule 56. The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56). The Supreme Court has instructed that a genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id.*

## III.

Before assessing the true nature of PEM's "service charge," the Court will briefly discuss Kentucky's pertinent statutory backdrop.

---

[4] Grace alleged a 15 U.S.C. § 1692e(5) violation in her complaint but has abandoned it in summary judgment briefing.

Kentucky's general interest and usury statute provides a default legal interest rate but also caps the upward deviation that parties may agree to in writing. For contracts where the original principal amount is $15,000 dollars or less, KRS § 360.010 provides the following:

> The legal rate of interest is eight percent (8%) per annum, but any party or parties may agree, in writing, for the payment of interest in excess of that rate as follows: (a) at a per annum rate not to exceed four percent (4%) in excess of the discount rate on ninety (90) day commercial paper in effect at the Federal Reserve Bank in the Federal Reserve District where the transaction is consummated or nineteen percent (19%), whichever is less . . . .

*Id.* This statute is one of general applicability, designed to protect consumers from usurious rates in consumer contracts. Unlike some states' usury laws, Kentucky does not limit the types of transactions covered by its statute.[5] The interest cap stated in KRS § 360.010 explicitly applies to "any contract or other obligation," which encompasses the medical services contract between Grace and PEM at issue here.

Over the years, Kentucky's legislature has carefully and explicitly delineated narrow exceptions for charges that certain businesses can collect without violating the general interest and usury statute.[6] The legislature also allows "time price differentials" at higher rates than the legal interest rate in retail installment transactions if a bevy of conditions are met.[7] None of those provisions apply here. Further, while some states have enacted specific statutory schemes governing medical services providers' ability to impose "late payment charges" on accounts

---

[5] Compare Washington's usury statute, discussed in *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027 (9th Cir. 2010), a case PSI cites in responsive briefing. Washington's law prohibits charging more than 12% annual interest "for the loan or forbearance of any money, goods, or things in action." Wash. Rev. Code § 19.52.020. Grace persuasively distinguishes the *Donohue* case in her surreply at DN 30, p.4.

[6] *See, e.g.*, KRS § 226.080 (outlining fees that pawnbrokers may charge on top of interest without offending the usury statute); KRS § 286.9-100 (allowing licensed check cashing and deferred deposit businesses to charge fees without implicating general usury law).

[7] KRS § 371.210 *et. seq.* governs retail installment transactions. PSI does not argue that PEM's contract with Grace fits the definition of a "retail installment contract." Indeed, the contract PEM drafted does not comply with those statutes. Thus, the case of *Munson v. White*, 217 S.W.2d 641 (Ky. 1949), which holds that charges made in connection with installment sales contracts do not constitute interest so as to implicate the usury statute, has no applicability here.

receivable,[8] Kentucky has not. In Kentucky, then, KRS § 360.010 applies to cap the interest rate that medical service providers with contracts like PEM's can charge patients.[9] Thus, if PEM's 18% per annum service charge on delinquent accounts is nothing more than disguised interest, it is usurious under Kentucky law.

A.

To decide whether PEM's contract violates Kentucky law, the Court must answer whether PEM's "service charge" is a veritable service charge or disguised interest. In Kentucky, when a party claims a transaction is usurious, courts have looked past the form of the transaction to its substance:

> No case is to be judged by what the parties appear to be or represent themselves to be doing, but by the transaction as disclosed by the whole evidence; and, if from that it is in substance a receiving or contracting for the receiving of usurious interest for a loan or forbearance of money the parties are subject to the statutory consequences, no matter what device they may have employed to conceal the true character of their dealings.

*Hurt v. Crystal Ice & Cold Storage Co.*, 286 S.W. 1055, 1056-57 (Ky. 1926) (citation omitted). Though the *Hurt* case has some age, it makes sense and has been referenced recently. *See Hamilton v. York*, 987 F.Supp. 953 (E.D. Ky. 1997) (citing *Hurt* approvingly and finding a company's "check cashing" and "deferral" charges to be, in substance, nothing more than interest bearing loans).

KRS Chapter 360 does not define the term "interest," but Kentucky courts construe the words of a statute according to their common and approved usage and to construe any ambiguity in such a way as to give a statute its intended effect. KRS § 446.080(4); *Devasier v. James*, 278 S.W.3d 625, 631 (Ky. 2009). To accomplish this directive, when a popular term is left undefined, Kentucky courts often look to the well-established definitions in Black's Law

---

[8] *See, e.g.*, *Weeks v. Geiermann*, 814 N.W.2d 792 (N.D. 2012) (discussing North Dakota's scheme).
[9] *Accord* OAG Opinions 70-800 and 72-598, discussed below.

Dictionary for guidance.[10] Black's Law Dictionary defines interest as "compensation fixed by agreement or allowed by law for the use or detention of money, or for the loss of money by one who is entitled to its use; esp., the amount owed to a lender in return for the use of borrowed money." Black's Law Dictionary (9th ed. 2009); *see also Brown v. Hiatts*, 82 U.S. 177, 185 (1872) (defining "interest" as the "compensation allowed by law, or fixed by the parties, for the use or forbearance of money, or as damages for its detention").

Looking through to the substance of the transaction between PEM and Grace, the Court is persuaded that what PEM's contract nominally calls a "service charge" is actually interest: *compensation fixed by agreement* or allowed by law *for the* use or *detention of money*, *or for the loss of money by one who is entitled to its use*." PEM is not a "lender" in the traditional sense of the term, but it anticipates from the outset of its relationship with patients the contingency that an account receivable may become past due, a situation in which it is an unwilling creditor.[11] PEM plans for this event by reserving the right to charge 1.5% per month against accounts that become 90 days or more past due.[12] Unless one turns words and circumstances on their heads, this charge appears to be disguised interest.

The Court is further persuaded by observing how PEM's charge operates. It functions as a penalty or delinquency charge.[13] It is assessed only in the event that a patient allows their debt

---

[10] *See, e.g.*, *Carter v. Smith*, 366 S.W.3d 414, 421 (Ky. 2012) (using Black's Law Dictionary to define "dismissal," as used in KRS § 61.810(1)(f)); *Devasier*, 278 S.W.3d at 630-31 (looking to Black's Law Dictionary to help define "to communicate" as used in the statute defining physicians' duty to warn intended victims).

[11] PEM does not contract for a forbearance; nothing in its intake contract prevents it from collecting a debt after it becomes due but before the passage of 90 days. Interestingly, for a number of months before PEM retains PSI's services, PEM attempts to collect the account itself. During this time, though, although PEM "retains all accounts for several months, typically less than six," it does not itself apply the service charge contemplated in the intake contract. Apparently, PEM hopes that this will "incentiv[ize]" debtors to pay before PEM retains PSI's services. *See* DN 21, ¶¶ 4-7.

[12] The contract does not define the date when an account becomes "due," but the Court assumes it was once services were rendered and insurance, if any, was processed.

[13] Even PSI essentially describes PEM's charge as a penalty: "'service charges' . . . are rightly perceived negative to the debtor by nature, they act as an incentive to timely perform on the debt, there is no intended benefit to the debtor

6

to become 90 days or more past due. Unfortunately, penalties fit within the ordinary legal meaning of "interest,"[14] thus, PEM's charge, whatever its name, would fall within the purview of KRS § 360.010.

Though not recent, two opinions from Kentucky's Office of the Attorney General affirm a broad construction of KRS § 360.010 and indicate that Kentucky courts would indeed look past the form of PEM's "service charge" and consider it interest.[15] In Opinion 70-800, the Attorney General answered a question from a consumer who believed he had been mischarged by his dentist. The dentist charged a denominated "carrying charge" of 3% per month on unpaid balances, a rate exceeding the interest cap set forth in KRS § 360.010. The OAG construed the question posed as "What is the maximum interest rate permitted by law to be charged on accounts remaining unpaid after their due date?" The OAG then answered that KRS § 360.010 applied regardless of how the fee was styled: "[A]ny greater rate of interest in the form of a delinquency charge on an account due and not covered by other statutory exceptions would constitute a violation of KRS 360.010." The OAG continued, "If the contract expressly provides

---

by design . . . the debtor 'opts in or opts out' of the 'service charge' when he/she signs the authorizing contract and then breaches its required performance." DN 27, p.4-5.

[14] *See Hiatts*, 82 U.S. at 185 (discussing the term "interest" in a statute of general applicability and defining it to encompass "damages for [money's] detention"). The Supreme Court has squarely rejected the argument that charges are not "interest" because they can be labeled "penalties." *See Citizens Nat'l Bank v. Donnell*, 95 U.S. 369, 373-74 (1904) (dismissing bank's argument that 12% charge on overdrafts did not violate state law setting 8% ceiling on interest rates because, *inter alia*, the overdraft charge "was a penalty because of a failure to pay a debt when due"); *see also Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 746-47 (1996) ("[T]he term 'interest' [in the National Bank Act] is not used in contradistinction to 'penalty,' and there is no reason why it cannot include interest charges imposed for that purpose."); *Pollice v. National Tax Funding, L.P.*, 226 F.3d 379 (3d Cir. 2000) ("In attempting to draw a valid distinction between 'interest' and 'penalty,' defendants argue that the former 'compensates the [municipality] for the lost time-value' of unpaid obligations, while the latter 'does not necessarily compensate the [municipality] for the lost value of money, and generally imposes an added cost on the delinquent party as punishment for noncompliance with the law.' . . . We, however, find this distinction to be artificial and thus we agree with the district court that a municipality should not be permitted to avoid the ten percent limit by arbitrarily labeling some portion of the monthly charge as 'penalty' rather than 'interest.'") (internal citations omitted).

[15] While not binding, Kentucky courts do sometimes refer to OAG opinions as useful and persuasive. *See, e.g.*, *York v. Com.*, 815 S.W.2d 415 (Ky. App. 1991) ("An attorney general's opinion is highly persuasive, [though] not binding on the recipient. . . . Thus we give great weight to the reasoning and opinion expressed in OAG 80-460 and OAG 82-588 that KRS 17.142 does not apply to court records.").

for the payment of deliquecy [*sic*] charges on the unpaid balance, the rate agreed upon must comply with KRS 360.010's requirements or it is usurious."[16]

Another such opinion, 72-598, answered the question of "whether a county hospital can charge interest on delinquent accounts." The OAG answered in the affirmative, reasoning it was well-established in Kentucky that interest is allowed as a "matter of right" for a failure to pay liquidated claims when due, even where parties do not contract for interest. *See Shanklin v. Townsend, Ky.*, 434 S.W.2d 655 (Ky. 1968). The Opinion went on, "Concerning what the legal rate of interest would be in such cases, KRS 360.010 [applies]."

In view of these considerations and the broad scope of KRS § 360.010, the Court finds that PEM should not be allowed to evade Kentucky's general usury statute and collect more interest than it would automatically be entitled under the statute simply because of its own craftily-worded contract.

B.

PSI's argument that PEM's charge is a true "service charge" only bolsters the Court's conclusion that it is merely a device to conceal usury. There is surprisingly little law in Kentucky of recent vintage that discusses what constitutes a "service charge." PSI relies heavily on an OAG Opinion ("Opinion 70-276") to argue that PEM's charge meets the elements of a passable service charge. That opinion in turn quotes *Ashland Nat'l Bank v. Conley*, 22 S.W.2d 270 (Ky. 1929) for the definition of "service charge," which is not really a definition per se, but rather a rule for when banks or other money lenders can charge fees on top of the maximum legal interest rate and not be accused of usury:

---

[16] Opinion 72-598 went on to "point out by way of caveat that . . . the answer [to the issue at hand] would be different if one were dealing with a 'Retail Installment Transaction' governed by KRS 371.210 through KRS 371.990." There were not enough facts before the OAG to determine whether the letter writer's contract with the dentist was a retail installment contract. Again, PSI does not argue the contract was a retail installment contract, and indeed, PEM's contract does not meet the statutory requirements to be treated as one.

> It is settled that, where the borrower agrees to pay the lender a sum greater than the legal rate of interest, if the consideration for this agreement is the use of the money loaned, it is usury, but, on the other hand, if the consideration is for services actually rendered to the borrower and the agreement for services is made in good faith, and is not a cloak to conceal usury, the transaction is not an usurious loan. The rule is thus stated in 27 R.C.L. 231: "The law seems to be well settled that where a contract for a loan provides for the rendition of services by the lender to the borrower, a fair charge for the services, in addition to the legal rate of interest on the money loan, does not render the contract usurious. *** But on accepted principles, a charge or commission for alleged services cannot be made for the purposes solely of evading the usury laws.

*Conley*, 22 S.W.2d at 272. Once again, this old case makes sense of a common place definition.

PSI argues that PEM's charge meets the elements of a passable service charge because (1) PEM denominated the charge a "service charge," (2) the charge is made in good faith, (3) for services rendered to borrower, and (4) constitutes reasonable reimbursement for PEM's extra costs of collecting delinquent debt and/or "may reflect some apportionment to the debtor of the additional cost of providing basic emergency medical services arising from its unpaid medical service reflecting back on the core operations." This Court disagrees.

First of all, PSI does not recite all of the "elements" of a bona fide service charge as set forth in *Conley*. Specifically, *Conley* contemplates a service charge as being an amount charged "*in addition to*" an interest rate. PEM's "service charge" is not charged in addition to any other charge or interest rate, a fact that counsels for finding it disguised interest. The rule allowing creditors to charge service charges without violating the general usury statute arose in the specific factual context of money lending and, so far, has been invoked exclusively in that context. For instance, Opinion 70-276 was written in response to a specific question from a traditional bank that charged the maximum legal rate of interest and wondered whether its practice of charging an additional 50 cents to put a new loan "on the books" violated the usury statute.

Further, "element" three is unmet here. There are simply no extra services provided *to* the debtor, Ms. Grace, in return for PEM's "service charge," as required by the rule in *Conley* that was reiterated in Opinion 70-276.[17] PSI's rationalization of the need for the charge is to no avail.[18] PSI's services benefit PEM, and PEM does not provide a service *to* Grace by retaining a debt collector. PSI argues "there is no intended benefit to the debtor by design (the service charge restores the creditor its extra costs)." But benefit or service *to the borrower* is an element of the equation for a charge to be considered a true "service charge."

Finally, PEM does not specify in its contract exactly what services are to underpin its so-called "service charge." It does not inform Grace that it will externalize collection costs after a certain point. Because of this, PEM's so-called "service charge" likely does not meet the "in good faith" element of a passable service charge, even assuming it meets all the other requirements.

C.

In sum, the Court finds that PEM's "service charge" is actually disguised interest. While PEM is certainly entitled to collect interest on a delinquent account, assuming it is liquidated,[19] it is not entitled to the usurious amount specified in its intake contract. PEM's charge is well above the legal rate of interest on consumer contracts where the principal debt is below $15,000. *See* KRS § 360.010. The normal penalty in this situation is that the provision is considered void as against public policy and the creditor is not entitled to any interest. *See Whitaker v. Smith*, 73

---

[17] Of course, PEM provided Grace the initial medical services, but these cannot underpin the "service charge" for the same reason that, if the consideration for a bank's service charge is the use of the money loaned, it is usury. *See* Ky. OAG Opinion 70-276; *Conley*, 22 S.W.2d at 272.

[18] "Clients such as our local hospitals and emergency rooms, which by law must provide health services regardless of ability to pay or number of prior defaults of debtor, are suffering millions of dollars of bad debt each month locally, increasingly with no place to turn for relief or assistance." DN 27, p. 8.

[19] "The general rule is that interest is allowed as a matter of right for failure to pay liquidated claims when due." *Shanklin v. Townsend, Ky.*, 434 S.W.2d 655 (Ky. 1968).

S.W.2d 1105, 1109 (Ky. 1934). For present purposes, the state law violation advances Plaintiff's theory of recovery under the FDCPA.

IV.

Because PEM was not entitled to charge 18% per annum interest under Kentucky law, PSI was not entitled to collect or report that amount to credit agencies. The Sixth Circuit has assumed without deciding that reporting a debt to credit agencies constitutes a "collection activity." *Purnell v. Arrow Fin'l Servs., LLC*, 303 F. App'x 297, 304 n.5 (6th Cir. 2008); *see also Sullivan v. Equifax*, 2002 WL 799856, *4 (E.D. Pa. 2002) (discussing the broad definition of the term "communication" in the FDCPA and concluding "[b]ecause reporting a debt to a credit reporting agency can be seen as a communication in connection with the collection of a debt, the reporting of such a debt in violation of the provisions of § 1629e(8) can subject a debt collector to liability under the FDCPA.") (internal quotation omitted). PSI's act of reporting an amount owing that included an unlawful amount of disguised interest apparently violates three separate provisions of the FDCPA: attempting to collect an amount not permitted by law (15 U.S.C. § 1692(f)(1)),[20] falsely representing the character, amount, or legal status of a debt (15 U.S.C. § 1692e(2)(A), and communicating credit information which is known or should be known to be false (15 U.S.C. § 1692e(8)).

Nevertheless, Plaintiff is not entitled to summary judgment on her FDCPA claims at this time because it is unclear from the record whether PSI's reporting occurred within the FDCPA's one-year statute of limitations.[21] Grace's complaint states that PSI reported her debt with

---

[20] *See Currier v. First Resolution Inv. Corp.*, 956 F.Supp.2d 747, 752 (E.D. Ky. 2013) (collecting cases and noting that collection efforts to collect an amount that is not authorized by law states a claim under 15 U.S.C. § 1692f(1)); *accord Duffy v. Landberg*, 216 F.3d 871 (8th Cir. 2000).

[21] Grace interchangeably describes PSI's offending conduct as having "reported" and "reporting" the PEM debt in her complaint filed in September 2013: "According to Ms. Grace's CLR, PSI *is reporting* negative information" (¶ 23); "PSI *reported* that the original amount of the debt was $292.00 and the current balance due on the account was $411" (¶ 26); ". . . PSI seeks to collect a debt [it has no] statutory or contract right to which to add interest or fees as

disguised interest in May 2012. Grace filed her complaint in September 2013. There is no "serial violation" to the FDCPA's statute of limitations, i.e., liability cannot be premised on the taint of the original decision to report the debt or on the original report itself. However, the Sixth Circuit has acknowledged that a violation occurs with each representation, communication, or collection activity such that each constitutes a discrete violation of the FDCPA. *See Purnell*, 303 Fed. App'x at *303. If Grace can show that PSI reported or answered a communication from the credit agencies confirming a debt with interest it was not entitled to after May 2012, and this discrete communication occurred within a year of Grace's complaint, Grace may be entitled to statutory relief under the FDCPA. Alternatively, Plaintiff may be able to persuade the Court that the discovery rule should be invoked here, as Grace did not discover PSI's reporting activity until she acquired a consumer liability report in May 2013. The Sixth Circuit has specifically left open the question of whether the discovery rule and/or tolling applies to the FDCPA statute of limitations. *Ruth v. Unifund CCR Partners*, 604 F.3d 908, 914 (6th Cir. 2010). At this point, however, these issues are unclear.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendant's motion to dismiss (DN 9) is DENIED.

IT IS FURTHER ORDERED that Plaintiff's cross motion for summary judgment (DN 23) is also DENIED.

---

PSI *is reporting* on Ms. Grace's credit report" (¶ 27); "PSI *reported* negative information concerning Ms. Grace's debt to [PEM] to consumer reporting agencies . . . ." (¶ 28).

cc: Counsel of Record